IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TRACEE STINEDURF, ) | Case No. 4:19 cv 0485 |
| ) | |
| Plaintiff, ) | JUDGE SARA LIOI |
| ) | |
| v. ) | MAGISTRATE JUDGE |
| ) | THOMAS M. PARKER |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | **REPORT & RECOMMENDATION** |
| Defendant. ) | |

**I.     Introduction**

Plaintiff, Tracee Stinedurf, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating a treating-source opinion, I recommend that the Commissioner's final decision denying Stinedurf's application for SSI be VACATED and that Stinedurf's case be REMANDED for further consideration.

**II.    Procedural History**

On November 23, 2015, Stinedurf protectively filed her application for SSI. (Tr. 452).[1] Stinedurf alleged that she became disabled on April 1, 1996, due to reflex sympathetic dystrophy syndrome ("RSD"), herniated disc, cervical radiculopathy and depression. (Tr. 452, 468). She

---

[1] The administrative transcript is in ECF Doc. 10.

later submitted an amended onset date of November 23, 2015. (Tr. 47). The Social Security Administration denied Stinedurf's application initially and upon reconsideration. (Tr. 385, 393). Stinedurf requested an administrative hearing. (Tr. 397). ALJ Gregory M. Beatty heard Stinedurf's case on May 17, 2018, and denied the claim in a June 20, 2018, decision. (Tr. 13-25). On January 25, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3). On March 5, 2019, Stinedurf filed a complaint to seek judicial review of the Commissioner's decision. ECF Doc. 1.

### III. Evidence

#### A. Relevant Medical Evidence

Stinedurf has been diagnosed with several conditions including lumbar discogenic disease, cervical radiculopathy, RSD, migraine headaches, anxiety, central sleep apnea and severe pain. She uses an implanted Medtronic infusion pump for pain medication. (Tr. 547).

On January 19, 2009, an MRI of Stinedurf's lumbar spine showed minimal discogenic lumbar disease. (Tr. 532). A polysomnography in September 2009 showed obstructive and central sleep apnea with central apnea being far more severe. (Tr. 529). A titration study in October 2009 showed that Bi-Pap was largely ineffective at improving the central apnea (a small decrease from 275 apneas to 191 apneas occurred on titration; REM sleep was not achieved.) (Tr. 530). On September 21, 2011, an electromyelogram study of Stinedurf's upper right extremity was normal. (Tr. 537).

On June 8, 2015, Stinedurf's pain pump was removed and replaced in a surgical resection, with extensive scar tissue. (Tr. 944). Following the surgery, Stinedurf reported increased problems with her RSD. On June 10, 2015, Stinedurf reported an increase in pain and limitation to her lower extremities and new pain problems in her upper left extremity. (Tr. 669-671). On examination she was very sensitive to light touch over her legs and left arm; she had

decreased strength in her legs and left upper extremity (decreased grip strength); she had muscle spasms in her lumbar spine; positive facet loading testing; and decreased range of motion in all planes. Mentally, she had a restricted affect; she was irritable and tearful. (Tr. 670-671). Positive findings such as muscle spasms, weakness, decreased sensation, decreased range of motion and hypersensitivity in her legs and left arm continued. (Tr. 678, 682, 687). Examination findings also showed swelling in her legs, discoloration and weakness of her left upper extremity, abnormal coordination, and sensory deficits in her lower extremities and left upper extremity. (Tr. 697).

At the end of 2015 and beginning of 2016, Stinedurf underwent a series of left stellate ganglion blocks to her left lower extremity. (Tr. 714, 722, 728). In February 2016, she went to the emergency room after falling on some steps. Examination showed decreased range of motion, tenderness to palpation, spasm and neurological hypersensitivity. (Tr. 782- 283). A CT scan of her cervical spine showed mild reversal of the cervical lordosis. (Tr. 888).

On March 2, 2016, Stinedurf reported neck pain. She had some extremity weakness and sensory deficit, although she displayed symmetrical strength. She continued taking medications for her conditions. (Tr. 850). Notes from March 7, 2016 show that Stinedurf may have misplaced a prescription; she reported having short-term memory problems. (Tr. 953). Stinedurf's pain management physician, Dr. Tracy Neuendorf's, examinations in July and August 2016 showed tenderness to palpation, spasm, reduced range of motion with pain, positive straight leg raise testing bilaterally, positive Faber's testing and positive Facet's testing. (Tr. 830, 833).

An x-ray of Stinedurf's right knee on September 9, 2016 showed mild medial compartment arthrosis and small joint effusion. During a pain management appointment with Dr. Neuendorf on November 6, 2016, Stinedurf complained of bilateral lower extremity pain and

3

left arm discoloration. (Tr. 956). She had tenderness, significant muscle spasms and reduced range of motion in all three planes of her spine.[2] She was able to ambulate without an assistive device. She had unusual spasm, numbness and tingling of her legs and arms. (Tr. 958).

On February 8, 2018, Stinedurf complained of ongoing low back pain radiating down her legs. She reported that her pain was aggravated with activity and controlled with her current pain medication and pain pump. (Tr. 979). Examination of her back showed tenderness, palpable spasms and decreased motion in her back with positive hyperreflexia. (Tr. 980). She displayed normal motor strength and a non-antalgic gait. (Tr. 980). Stinedurf declined physical and aquatic therapy referrals and continued her medication regimen. (Tr. 981).

On March 12, 2018, at another pain management appointment for refill of her pain pump, Stinedurf reported ongoing low back pain. She described the pain as radiating from her back down her legs to her feet and in her left arm, with numbness and tingling. (Tr. 975). Examination showed cervical spine muscle spasms, multiple trigger points and texture, asymmetry, altered range of motion and tenderness changes. She also had tenderness in her trapezius and paraspinal muscles, limited neck range of motion due to pain, RSD spread to left arm with positive Spurling sign in the left arm, bilateral paraspinal muscle spasm, decreased range of motion in the back, positive RSD in the lower limbs, positive hyperreflexia, osteoarthritis of the right knee, and positive lumbar facet loading bilaterally. (Tr. 977-978).

    **B.**    **Relevant Opinion Evidence**

        **1.**    **Treating Source Opinion—Tracy Neuendorf, D.O.**

On August 23, 2017, Dr. Neuendorf completed a medical source statement. (Tr. 965-966). He opined that Stinedurf was unable to lift more than 10 pounds; could stand and walk no

---

[2] Dr. Neuendorf's notes also stated, seemingly in contradiction, that Stinedurf had full range of motion, no tenderness, palpable spasm or pain on motion in her back. (Tr. 957).

more than an hour a day; could sit no more than two hours a day (Tr. 966); would rarely be able to reach, push/pull and perform gross manipulation; and would occasionally be able to perform fine manipulation. He opined that Stinedurf's pain was likely to cause absenteeism and off-task behaviors. He opined that she would require six hours of breaks beyond those normally allowed in a typical work environment. Dr. Neuendorf stated that his opinions were based on physical exam. He also opined that Stinedurf would be unable to engage in any meaningful employment. (Tr. 967).

### 2. State Agency Consulting Examiner, Jennifer Haaga, Psy.D.

On April 19, 2016, consulting psychologist, Jennifer Haaga, examined Stinedurf at the request of the state agency. (Tr. 772-779). Dr. Haaga diagnosed persistent depressive disorder, late onset with anxious distress with intermittent major depressive disorder. (Tr. 777). Dr. Haaga reported that Stinedurf would be limited to performing simple routine tasks; would likely need reminders and assistance (particularly when learning new jobs); would have some difficulty with attention and concentration, with her symptoms of anxiety and depression likely causing difficulties in this area or exacerbating those difficulties that she already had. She would likely also have increased symptoms if faced with pressure in a work situation particularly if she felt she was not able to complete tasks. (Tr. 778). Dr. Haaga also noted that Stinedurf was tearful, shifted in her chair at times and appeared uncomfortable. (Tr. 775).

### 3. State Agency Reviewing Physicians

On January 29, 2016, state agency reviewing physician, Stephen Sutherland, M.D., reviewed Stinedurf's records. He opined that Stinedurf could perform light work, but she could never climb ladders, ropes, or scaffolds; she could frequently stoop, kneel, crouch, crawl, and climb ramps or stairs; and she must avoid concentrated exposure to temperature changes, vibration and hazards. (Tr. 362-363).

On April 28, 2016, a state agency psychologist, Judith Schwartzman, Psy.D., reviewed Stinedurf's records and opined that she was limited to simple, routine tasks without strict time or production standards, in a non-public environment where interactions with others were brief and superficial. She opined that supervisors must offer constructive criticism in a relatively static environment with advance notice and gradual implementation of major changes. (Tr. 363-365).

Another state agency reviewing physician, Mehr Siddiqui, M.D., reviewed Stinedurf's records on September 7, 2016. She generally agreed that Stinedurf was limited to light work with the same postural limitations as Dr. Sutherland. However, she opined that Stinedurf could only stand and/or walk for four hours and must be able to alternate positions every thirty minutes due to her RSD. (Tr. 378). Dr. Siddiqui did not opine as to any environmental restrictions except that Stinedurf must avoid exposure to all hazards. (Tr. 379).

### C. Relevant Testimonial Evidence

Stinedurf testified at the ALJ hearing. (Tr. 36-62). At the time, she was thirty-eight years old, 5'7" tall and weighed 190 pounds. (Tr. 36). She did not have a job and lived with her mother. She had a driver's license and drove occasionally. (Tr. 37). Stinedurf graduated from high school but had very little work experience. (Tr. 38).

Stinedurf stated that she could not work due to chronic pain from RSD, stemming from knee surgery when she was 15 years old. (Tr. 38-39). Both of her legs were affected down to her feet and it had recently spread to her left arm. The pain was constant and aggravated by stress, anxiety and lack of sleep. (Tr. 39-40). Stinedurf had a machine implanted that delivered regular pain medication. The machine allowed her to administer more pain medication as needed and she usually did that at least twice a day. (Tr. 40).

Stinedurf's pain affected her ability to walk. With even small amounts of walking, her knees would start to swell. (Tr. 41). She did not use an assistive device to walk but occasionally

6

used knee braces. (Tr. 55). She did not have good grip strength in her left hand and frequently dropped things. She also reported poor memory. (Tr. 46).

Stinedurf did not sleep well due to pain and sleep apnea. (Tr. 41). She was not using a CPAP or a BiPAP machine, but was planning to see a specialist at the Cleveland Clinic for this condition. (Tr. 42).

Stinedurf also got migraines at least eight times a month that lasted about a day. (Tr. 43). During her migraines, she was very sensitive to light, smell, or anything that rubbed against her arms or legs. (Tr. 42). Treatment included medication and staying in a dark, quiet room until her headaches passed. (Tr. 43).

Stinedurf saw Dr. Neuendorf approximately once a month for her RSD. (Tr. 43). She had been seeing him for the past 20 years. Her first pain pump had been installed when she was 19 years old and it had been replaced three times. (Tr. 44). RSD caused pain, swelling and discoloration. (Tr. 45). Stinedurf reported that her pain had worsened after her last pump implant and that she had pretty much been homebound since then. (Tr. 47). Stinedurf was hoping to have a spinal stimulator implanted. However, her condition was not likely to improve. She felt that it had worsened over the past three years. (Tr. 61).

Stinedurf also had depression and anxiety. She took medication for these conditions. She had panic attacks when she had a flare up due to pain. (Tr. 59-60).

On a typical day, Stinedurf got up at 7:30 a.m. to take morning medication, which made her tired. She would rest or go back to sleep until noon, if she could sleep. She fed her dog twice a day. (Tr. 48). She spent most of her time in bed or on the couch. (Tr. 58). She could occasionally wash clothes and could cook maybe once a month. Her mom did most of the cooking. Stinedurf tidied her room but otherwise did not do household cleaning. (Tr. 49-50). She did not shop or visit anyone. Her sister would occasionally visit her.

7

Thomas Nimberger, a vocational expert ("VE"), also testified at the ALJ hearing. (Tr. 62-68).  Because Stinedurf does not present any claim of error related to the opinions of the VE, my summary of his testimony is abridged.  Stinedurf did not have any previous work experience, but the VE testified that a hypothetical individual described by the ALJ would be able to find work.  The VE opined that an individual could be off-task up to 10% of the time and could miss no more than two days a month.  (Tr. 66).  However, this amount of off-task time and absenteeism would probably not be tolerated during the probationary period.  (Tr. 68).

When questioned by Stinedurf's attorney, the VE opined that there would be no jobs available for an individual who was limited to sedentary work, could not crouch, kneel or crawl; could not be exposed to vibration; could not have noise louder than an office setting; could not reach overhead with her left; could occasionally reach chest-high with her left but with no weight in her hand.  She could not have any physical contact with others – coworkers, supervisors or other people.  (Tr. 66-67).  He also opined that an individual who required an at-will lay down option in a dark room would need an accommodation from an employer.  (Tr. 67).

**D.    The ALJ's Decision**

The ALJ made the following findings relevant to this appeal:

2. Stinedurf had the severe impairments of depressive disorder and reflex sympathetic dystrophy.  (Tr. 18).

4. Stinedurf had the residual functional capacity to perform sedentary work, except she could frequently reach on the left; she could frequently finger and handle objects with her left hand.  She could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  She could never climb ladders, ropes or scaffolds.  She could never work at unprotected heights; never work around moving mechanical parts; and never operate a motor vehicle.  She needed to avoid concentrated exposure to dusts, odors, fumes, pulmonary irritants, extreme cold, and extreme heat.  She was limited to a moderate noise environment and to simple routine tasks, but not at a production rate pace.  She was limited to few changes in a routine work setting.  (Tr. 20).

8

> 9. Considering her age, education, work experience, and residual functional capacity, there were jobs existing in significant numbers in the national economy that Stinedurf could perform. (Tr. 24).

Based on all his findings, the ALJ determined that Stinedurf had not been under a disability since November 23, 2015, the day her application was filed. (Tr. 25).

## IV. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If supported by substantial evidence and reasonably drawn from the record, the Commissioner's factual findings are conclusive – even if this court might reach a different conclusion or if the evidence could have supported a different conclusion. 42 U.S.C. § 405(g); *see also Elam*, 348 F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the

10

national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B. Treating Physician's Opinion

Stinedurf argues that the ALJ failed to properly explain his reasoning for assigning less than controlling weight to the opinion of her treating physician, Dr. Neuendorf. Stinedurf argues that the ALJ did not provide adequate reasons for assigning little weight to Dr. Neuendorf's opinion and that the ALJ substituted his own opinion for that of the treating physician. ECF Doc. 12 at 13.

The Commissioner argues that the ALJ adequately explained his reasons for assigning little weight to Dr. Neuendorf's opinion. The Commissioner cites the ALJ's statement that Dr. Neuendorf's notes did not support the extreme limitations in his medical source statement. The ALJ noted that Stinedurf had modest strength deficits and was able to ambulate without an assistive device. ECF Doc. 14 at 6-8.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence

11

supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. § 404.1527(c). Inconsistency with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion. *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). Nothing in the regulations requires the ALJ to explain how he considered each of the factors. *See* 20 C.F.R. § 404.1527(c). Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned."). When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate. *Cole*, 661 F.3d at 939.

"[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations

12

consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. § 404.1527(c). An ALJ may rely on a state agency consultant's opinion and may give it greater weight than other opinions if it is supported by the evidence. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015). Further, an ALJ may rely on a state agency consultant's opinion that predates other medical evidence in the record, if the ALJ takes into account any evidence that the consultant did not consider. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

After summarizing Dr. Neuendorf's opinions from his medical source statement, the ALJ stated:

> I do not give controlling weight to Dr. Neuendorf's opinion. While [he] treated claimant, [his] own treatment notes failed to document the severe functional limitations that Dr. Neuendorf described. Although the claimant had some strength deficits at times, the deficits were relatively modest and did not support the finding that the claimant could lift only ten pounds. Additionally, the claimant did not exhibit such substantial upper extremity dysfunction. Furthermore, the exams showed that the claimant ambulated without an assistive device and there was no evidence that she was prescribed the use of such a device. Finally, there is little explanation of why the claimant required the extensive breaks that Dr. Neuendorf and the determination of the ability to work is reserved to the Commissioner. Accordingly, I afford little weight to Dr. Neuendorf's opinion.

(Tr. 23-24.)

The ALJ's reason for assigning little weight to Dr. Neuendorf's opinions was because his own treatment notes failed to support his opinions. Specifically, the ALJ stated that the record showed that: 1) Stinedurf's strength deficits were "relatively modest" and did not support that she was limited to lifting 10 pounds; 2) Stinedurf ambulated without an assistive device; and 3) Neuendorf didn't explain why Stinedurf required extensive breaks. Finally, the ALJ properly noted that the determination of the ability to work is reserved to the Commissioner. See 20 C.F.R. § 416.927(d)(1).

13

Regarding Stinedurf's "modest" strength deficits, the ALJ acknowledged that the record contained evidence of strength deficits. Despite this evidence, the ALJ characterized the strength deficits as "modest" with no explanation of how he arrived at that opinion. As Stinedurf argues[3], the ALJ does not have medical expertise and cannot substitute his opinion over the medical opinion of a treating physician. *Meece v. Barnhart,* 192 F. App'x 456, 465 (6th Cir. 2006); *Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 189 (6th Cir. 2009).

Earlier in his decision, the ALJ cited (7F/45) to show that Stinedurf had "normal extremity strength." However, the page cited by the ALJ does not state that Stinedurf had normal extremity strength. Rather, it states:

> **Extremities:**  edema left upper limb with discoloration and weakness
> **Pulses:** 2+ and symmetric
> **Neurologic:**  Patient is alert and oriented times three.  Positive findings: abnormal muscle tone left upper and lower limbs, muscular weakness left upper and lower limbs, abnormality of coordination, sensory deficit left upper and lower limbs speech normal, mental status intact, cranial nerves 2-12 intact.
> **Motor:**  motor exam is 5 out of 5 all extremities with the exception of weakness of the left upper and lower limbs.

(Tr. 697). This note shows that Stinedurf could *move* all her extremities, but it also notes weakness in her left leg and arm. (Tr. 697). The ALJ also cited (10F/2) for the proposition that Stinedurf had "normal extremities." This treatment note also stated that Stinedurf could *move* all her extremities. (Tr. 783). The ALJ cited no evidence to support the conclusion that being able to move one's extremities equates to being able to lift more than 10 pounds. The ALJ failed to cite any medical evidence contradicting Dr. Neuendorf's opinion that Stinedurf was limited to lifting 10 pounds. The records cited by the ALJ actually support this part of Dr. Neuendorf's opinion.

---

[3] Stinedurf contends that the ALJ's assignment of little weight to the opinions of the state agency reviewing physicians – further supports her argument that he substituted his own opinion for the medical opinions in the record.  ECF Doc. 12 at 14-15.

14

Dr. Neuendorf's medical statement contains checked boxes indicating that a cane, walker, brace and TENS unit had been prescribed. (Tr. 967). The ALJ rejected Dr. Neuendorf's opinion, in part, because there there was no evidence that Stinedurf had been prescribed any assistive device. The ALJ's decision cited medical records showing that Stinedurf could ambulate without an assistive device. (Tr. 22) (citing 13F/21 [Tr. 847] and 18F/6 [Tr. 980].)

Stinedurf doesn't claim she needed an assistive device, and her brief does not cite any evidence showing that she was prescribed an assistive device. However, she had been seeing Dr. Neuendorf for twenty years. (Tr. 44). It is possible that Dr. Neuendorf prescribed these devices early on in her treatment or before she claimed disability. Or, Dr. Neuendorf may have recognized that such devices could have been prescribed considering Stinedurf's condition. Regardless of whether an assistive device could have been prescribed, this issue does not seem particularly significant. As already noted, Stinedurf didn't claim that she needed an assistive device. Dr. Neuendorf opined that she was capable of standing and/or walking for a half hour without interruption. (Tr. 966). Given the long treatment history between this physician and Stinedurf, the fact that the record did not contain treatment notes documenting prescriptions of assistive devices was not a valid reason for rejecting Dr. Neuendorf's opinion. Presumably, the ALJ did not review medical records for the entire 20 years that Dr. Neuendorf had been treating Stinedurf because the record does not contain 20 years of Dr. Neuendorf's treatment notes.

The ALJ also rejected Dr. Neuendorf's opinion that Stinedurf required additional rest periods during her workday. He stated that Dr. Neuendorf did not explain why Stinedurf needed such breaks. This criticism of Dr. Neuendorf's opinion did not actually cite any contradiction - nor is any apparent in the record. In fact, the record supports Stinedurf's likely need for significant rest periods. She had never worked; was wearing a pain pump to treat her constant, chronic pain; and spent most of her time in bed or on the couch. (Tr. 58). Stinedurf rarely went

15

anywhere and contributed very little to the maintenance of her household.  (Tr. 49-51).  The ALJ did not cite any records contradicting these statements.  As noted, the record supported Dr. Neuendorf's opinion that Stinedurf would need significant rest periods during the workday.  The ALJ did not cite any record evidence contradicting this opinion but criticized it only because it was not better explained.

It was proper for the ALJ to reject Dr. Neuendorf's opinion that Stinedurf was unable to work.  20 C.F.R. § 416.927(d)(1) provides that a medical source's statement that a claimant is "unable to work" does not require the ALJ to determine that an individual is disabled.  However, his other reasons for rejecting Dr. Neuendorf's opinions were not good ones.  There is no requirement that the ALJ incorporate all the information upon which he relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x. 674, 678–79 (6th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").  But even when I consider the entire ALJ opinion, I find an absence of any citations to record evidence contradicting Dr. Neuendorf's opinions.  Nor did the ALJ discuss the length and frequency of treatment, the consistency of the opinion with the record as a whole, and whether Dr. Neuendorf was a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6).  Dr. Neuendorf had a long treating relationship with Stinedurf.  The ALJ was required to state good reasons to support a decision to assign less than controlling weight to his opinion.  I find that the ALJ failed to do so.

The ALJ's failure to follow proper legal standards in evaluating Dr. Neuendorf's opinion resulted in a failure to build an accurate and logical bridge between the evidence and the denial of Stinedurf's application for SSI.  *Fleischer*, 774 F. Supp. 2d at 877.  Accordingly, I recommend that the Court vacate the ALJ's decision denying Stinedurf's application for SSI and remand the case for further consideration of Dr. Neuendorf's treating source opinions.

C.   **RSD and Social Security Ruling 03-2p.**

Stinedurf argues that the ALJ failed to evaluate her RSD in accordance with SSR 03-2p, 2003 SSR LEXIS 2. Considering the agency's stated policy, Stinedurf argues that it was inappropriate for the ALJ to determine that her RSD was not disabling due to normal muscle strength and her ability to ambulate without an assistive device. Stinedurf points out that the ALJ's decision did not even mention SSR 03-02p. Stinedurf argues that the ALJ inappropriately evaluated her condition the same as he would have any other impairment.

The Commissioner argues that it was not improper for the ALJ to evaluate Stinedurf's RSD as he would have any other impairment. He cites *Shepard v. Comm'r of Soc. Sec.,* 705, F. App'x. 435, 439 (6th Cir. 2017), in which the Sixth Circuit Court of Appeals held that an ALJ properly applied the sequential evaluation process required by SSR 03-2p, 2003 SSR LEXIS 2, even though he did not explicitly cite it in his decision.

Social Security Ruling, SSR 03-2p explains the agency's policy for evaluating claims of reflex sympathetic dystrophy syndrome. SSR 03-2p recognizes that the degree of reported pain with RSD is often out of proportion to the severity of the injury sustained by the claimant and that, when left untreated, the signs and symptoms of the disorder may worsen over time. *Id.* SSR 03-02p provides that

> Opinions from an individual's medical sources, especially treating sources, concerning the effect(s) of RSDS/CRPS on the individual's ability to function in a sustained manner in performing work activities, or in performing activities of daily living, are important in enabling adjudicators to draw conclusions about the severity of the impairment (s) and the individual's RFC. In this regard, any information a medical source is able to provide contrasting the individual's medical condition(s) and functional capacities since the alleged onset of RSDS/CRPS with the individual's status prior to the onset of RSDS/CRPS is helpful to the adjudicator in evaluating the individual's impairment (s) and the resulting functional consequences.

Here, the ALJ failed to properly explain his reasoning for assigning less than controlling weight to the opinion of Stinedurf's treating physician. SSR 02-3p provides that opinions from

treating sources are important in assessing an RSD claimant's ability to function in a sustained manner. By failing to properly evaluate the medical opinion evidence, the ALJ may have improperly devalued important evidence regarding Stinedurf's impairment and her ability to function in the workplace in a sustained manner. Although the ALJ is not required to specifically mention SSR 02-3p in his decision, he is required to properly evaluate the treating source's opinion recognizing its significance in light of the unique symptoms of RSD. More importantly, the ALJ's handling of this evaluation should be sufficiently clear to permit the court to conclude that the substance of the regulation was followed even if it was not specifically mentioned. Here I cannot make that conclusion. At a minimum, the ALJ's handling of this regulation did not build a logical bridge that would permit the claimant to understand the denial of benefits or the court to perform its statutory review function. As already stated, I recommend that the Court vacate the ALJ's decision denying Stinedurf's application for SSI and remand the case for further consideration of Dr. Neuendorf's treating source opinion. I further recommend that the Court direct the ALJ to specifically account for the requirements of SSR 02-3p.

## V. Recommendation

Because the ALJ failed to apply proper legal standards in evaluating Dr. Neuendorf's opinion and could have more clearly explained his handling of SSR 02-3p, I recommend that the Commissioner's final decision denying Stinedurf's application for supplemental security income be VACATED and that Stinedurf's case be REMANDED for further consideration.

Dated: December 20, 2019

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).

19